06-5786-bk(L)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: June 12, 2007                    Decided: October 5, 2007)

Docket Nos.:

06-5786-bk(L), 06-5797-ag (con), 06-5798-bk (con), 06-5799-bk (con), 06-5800-bk (con),
06-5801-bk (con), 06-5804-bk (con), 06-5806-bk (con), 06-5807-bk (con), 06-5808-bk (con),
06-5810-bk (con), 06-5811-bk (con), 06-5812-bk (con), 06-5813-bk (con)

IN RE REFCO INC.,

KENNETH M. KRYS and CHRISTOPHER STRIDE, as Joint Official Liquidators of SPhinX Managed Futures Fund SPC, FRIEDBERG GLOBAL MACRO HEDGE FUND LTD., FRIEDBERG GLOBAL MACRO HEDGE FUND, ROZEL INVESTMENTS LTD., MASONIC HALL & ASYLUM FUND, MASONIC MEDICAL RESEARCH LABORATORY, OFI ASSET MANAGEMENT, CAYMAN ISLAND JOINT PROVISIONAL LIQUIDATORS, MERRILL LYNCH INTERNATIONAL, MERRILL LYNCH, RAYMOND JAMES & ASSOCIATES, RAYMOND JAMES FINANCIAL SERVICES, CAISSE DE DEPOT ET PLACEMENT DU QUEBEC, SPHINX ACCESS LLC, SPHINX ACCESS LTD., SPHINX MANAGED FUTURES INDEX FUND, LP,

*Appellants,*

–v.–

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF REFCO INC., MARC S. KIRSCHNER, as Chapter 11 Trustee of Refco Capital Markets, Ltd., and REFCO INC.,

*Appellees.*

Before:

JACOBS, *Chief Judge*, WESLEY, GIBSON,* *Circuit Judges*.

Appeal from an order of the United States District Court for the Southern District of New York (Berman, *J.*), entered November 16, 2006, affirming an order of the Bankruptcy Court for the Southern District of New York (Drain, *J.*), approving the settlement of a preference action against the creditor.

AFFIRMED.

KAREN OSTAD, Morrison & Foerster LLP, New York, New York, *for Appellant Joint Official Liquidators* (Gary S. Lee, David Capucilli, *on the brief*).

MARK H. EPSTEIN, Munger Tolles & Olsen LLP, Los Angeles, California, *for Appellant Investors* (Marc T.G. Dworsky, Todd J. Rosen, Munger Tolles & Olsen LLP, Los Angeles, California; Joseph Zagraniczny, Jonathan B. Fellows, Stephen A. Donato, Bond Schoeneck & King, PLLC, Syracuse, New York; Stephen J. Shimshak, Christopher A. Jarvinen, Paul, Weiss Rifkind, Wharton, & Garrison LLP, New York, New York; Joseph Serino Jr., Matthew Solum, Kirkland & Ellis LLP, New York, New York, *on the brief*).

ANDREW M. LEBLANC, Milbank, Tweed, Hadley & McCloy LLP, New York, New York, *for Appellees* (Luc A. Despins, Dennis C. O'Donnell, Jessica L. Fink, Milbank, Tweed, Hadley & McCloy LLP, New York, New York; Tina L. Brozman, Timothy B. DeSieno, Bingham McCutchen LLP, New York, New York, *on the brief*).

WESLEY, *Circuit Judge*:

Appellants – Investors and Joint Official Liquidators of Sphinx SPC ("Sphinx"),[1] –

---

* The Honorable John R. Gibson, Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

[1] An SPC is a Segregated Portfolio Company.

-2-

appeal from an order of the district court affirming an order of the bankruptcy court approving the settlement of a preference action pursuant to Federal Rule of Bankruptcy Procedure 9019. Because we conclude that Investors have no standing to contest the settlement, and that the Joint Official Liquidators are precluded from appealing the settlement, we affirm the district court's order.

**BACKGROUND**

Appellant Investors each hold various interests in Sphinx, an exempted investment company incorporated and organized under the Companies Law (2004 Revision) of the Cayman Islands ("Cayman Companies Law"). In an SPC, each investor's assets and liabilities are held in a particular portfolio, or "cell," managed by the company.[1]

Prior to the commencement of this litigation, the directors of Sphinx had hired PlusFunds Group, Inc. ("PlusFunds"), a registered investment advisor, to manage Sphinx in exchange for management fees. Investors allege that PlusFunds in turn hired Refco Alternative Investments ("RAI") to oversee Refco-related investments for Sphinx. According to Investors, RAI regularly executed trades for Sphinx, as directed by PlusFunds, and oversaw its margin cash. Investors

---

[1] Because we need not decide any issue of Cayman Islands law to resolve this appeal, we assume the accuracy of the parties' submissions to the extent there is no conflict between them. *Compare Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 28 & n.2 (2d Cir. 1998) (deciding issue of foreign law *de novo* under Federal Rule of Civil Procedure 44.1, and noting that this Court is "not required to take all allegations of [foreign] law proffered by Petitioners to be true as they contend"). According to the parties, the SPC structure permits a company to segregate the assets and liabilities it holds on behalf of a particular investor from the assets and liabilities it holds on behalf of other investors, and from the general assets of the company itself. While an SPC is a single legal entity, the individual cells within it are not. Sphinx manages fifteen separate cells.

further allege that RAI, at PlusFunds' direction, caused Sphinx's excess margin cash to be invested in accounts at its affiliate, Refco Capital Markets, Ltd. ("RCM"), the debtor in the underlying bankruptcy proceeding.[2]

On October 12, 2005, five days before Refco, Inc. ("Refco") filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code, and two days after Refco announced it had discovered a substantial, previously undisclosed liability that caused a crisis of confidence in RCM's ability to accommodate client withdrawals, a total of $312,046,266.23 was transferred from the Sphinx accounts at RCM to its affiliate Refco, LLC, and ultimately to accounts held on behalf of the cells at Lehman Brothers. Investors allege that this transfer was made at the behest of PlusFunds CEO Chris Sugrue, who Investors further allege maintained previously undisclosed allegiances to Refco.

With the authorization of the bankruptcy court, on December 16, 2005 the Committee commenced an adversary proceeding on behalf of RCM seeking avoidance and recovery of the transfer made to the cells, naming as defendants Sphinx, and Sphinx acting on behalf of each of the cells. There was evidence that the transfer was preferential, and, on January 9, 2006, the

---

[2] According to Investors, directors of an SPC are required by law to keep each cell's assets segregated and separately identifiable from the others. Where a particular cell incurs liability in excess of its assets, the creditor may be paid first from the assets of the liable cell, and then from the SPC's general assets, if permitted by the articles of association and only to the extent that the company's general assets exceed any minimum capital amounts required by Cayman regulatory law. In no case may the assets of one cell be permitted to satisfy the liabilities of another. Investors allege that RAI placed the cells' funds in unsegregated accounts at RCM. By contrast, Appellees – the Official Committee of Unsecured Creditors of Refco Incorporated and its affiliated debtors and debtors-in-possession ("Committee") – assert that Investors' funds were held in separate accounts in the name of each of the cells while at RCM.

Committee filed a motion for summary judgment in the adversary proceeding. Sphinx opposed the motion, arguing that whether Refco was insolvent at the time of the transfer was a material issue of fact, and that, even assuming that the elements for a preference were satisfied, it was inequitable to allow RCM to recover the entire $312 million because RCM and its non-debtor affiliates had abused the bankruptcy process to the detriment of Sphinx. On April 20, 2006, at the close of discovery, and on the eve of the summary judgment argument, the Committee and Sphinx agreed to a settlement whereby Sphinx, on behalf of the cells, would return $263 million to the RCM estate (the "Settlement"). Sphinx also agreed to waive any claim against RCM related to the transfer, including any claim pursuant to § 502(h) of the Bankruptcy Code.[3]

Investors claim that the "worse-than-losing" Settlement was the result of an "incestuous relationship" between Refco, PlusFunds, and Sphinx. *In re Refco Inc.*, No. 05-60006, 2006 WL 3409088 (S.D.N.Y. November 16, 2006), at *1. Investors point out that preference actions are typically settled with the transferee retaining some premium over what it might expect to receive as a general creditor; this premium reflects the risk that the estate might not prevail in the preference action. Here, Investors argue, Sphinx agreed to return all but about fifteen percent of the purported preference *and* to abandon any future claims against the RCM estate arising from the transfer at issue.[4] The Committee responds that the Settlement was fair given the weakness of Sphinx's defenses, and the cost, expense, and delay associated with further litigating the legal

---

[3] 11 U.S.C. § 502(h) permits a party to file a claim against the bankruptcy estate upon surrender of a preference.

[4] According to Investors, the mere 15.7 cents on the dollar that the Settlement gave them was about half the market value of even the most junior claims against the estate.

and factual issues in the adversary proceeding. The Committee also argues that the inclusion of the § 502(h) waiver in the Settlement was reasonable because: (1) in order to assert a claim pursuant to § 502(h), Sphinx would have been required to repay the full amount of the transfer, which Sphinx contended it could not do consistent with Cayman law, (2) Sphinx, unlike other creditors of the RCM estate, would recover on its related claims against RCM immediately through the Settlement and did not have to wait for a plan of reorganization, and (3) even if Sphinx satisfied the requirement for making a § 502(h) claim by returning the entire amount of the transfer, plus interest, other parties may have sought to equitably subordinate Sphinx's claim against RCM.

Investors filed objections to the Settlement in bankruptcy court, arguing that it was not the product of honest bargaining but, rather, collusion and fraud. They further argued that the evidence suggested that the proposed Settlement was not a properly authorized corporate act by Sphinx. Finally, Investors asserted that the Settlement was an attempted fraud that was consummated by abuse of the bankruptcy process. Investors claimed "that PlusFunds, Refco, and Sphinx were three faces of the same entity, that Refco's control over Sphinx eliminated any meaningful adversity between the negotiating parties, and that this rendered the proposed settlement non-arms length, collusive, and in bad faith." Investors Br. at 14-15.

On June 1, 2006, while the Settlement was *sub judice*, involuntary liquidation proceedings were commenced in the Grand Court of the Cayman Islands against Sphinx and an affiliated parent entity, Sphinx Strategy Fund, Ltd. ("Strategy"). On June 5, 2006, the Grand Court of the Cayman Islands issued an order appointing a Provisional Liquidator for Strategy and

imposing a "stay . . . [of] all actions, suits or proceedings against [Sphinx] until the hearing of the Petition for winding up."[5] *Refco*, 2006 WL 3409088, at \*2. On June 8, 2006, the bankruptcy court heard oral arguments on Investors' objections. Prior to reaching the merits of the Settlement, the bankruptcy court denied Investors' request to stay the hearing in light of the Grand Court's order because the court did not believe the stay was intended to reach the bankruptcy proceeding: "I do not believe that a motion by the creditors committee here for approval of its entry into the settlement agreement is in any way 'against' either Strategy [] or [Sphinx]. That is because the issues that I am to determine in the motion go to the effect of the settlement on the debtors before me and their creditors." *Id.*

After hearing arguments from all parties, including Investors, the bankruptcy court approved the Settlement as being in the best interests of the debtors, their estates and creditors. The bankruptcy court held that Investors lacked standing to object because they were not a "party in interest" under § 1109(b) of the Bankruptcy Code. The court held as a matter of law that the Settlement affected Investors as equity holders in Sphinx only indirectly. The court noted that reviewing the Settlement's fairness to Investors was outside its purview because such review

> would entirely skew the task of a Bankruptcy Court and be extremely unfair to debtors and trustees in that it would force them, in essence, to continue negotiating and potentially litigating not only with the defendants that they're dealing with in litigation, but also parties who claim an interest in those defendants, which is simply inappropriate.

---

[5] On June 7, 2006, Strategy filed for protection in the Bankruptcy Court for the Southern District of New York under Chapter 15 of the Bankruptcy Code. On June 27, 2006, the involuntary liquidation proceedings were dismissed by the Grand Court of the Cayman Islands. Voluntary bankruptcy proceedings were commenced against Sphinx in July and August 2006.

*Id.* at \*8 (quoting Bankruptcy Court Transcript).

The court acknowledged Investors' allegation that the Settlement was the product of fraud, but stated that the only relevant inquiry in bankruptcy court is whether the *debtor* acted in good faith to ensure that the Settlement is favorable to the estate, and, in this case, there was no dispute that the Committee acted in the best interests of the estate.

Investors appealed the approval order to the district court, arguing that: (1) their interest was sufficiently direct, adverse, and pecuniary to establish appellate standing, (2) they were a "party in interest" under § 1109(b) and therefore had standing to object in the bankruptcy court proceeding, (3) the scope of judicial review in a bankruptcy proceeding was broad enough to consider the rights of affected third parties and, therefore, the bankruptcy court erred when it held that it was legally precluded from considering whether the Settlement was fair to Investors, and (4) the bankruptcy court abused its discretion because it did not accord the Grand Court's order comity. *See Refco*, 2006 WL 3409088, at \*3 (citations omitted).

Investors' arguments to the district court were equivocally supported by Appellants Kenneth Krys and Christopher Stride, Joint Official Liquidators ("JOLs") of Sphinx. On August 8, 2006, the Cayman Court entered a winding-up order for Sphinx and appointed Krys and Stride to serve as JOLs. The JOLs stepped into the shoes of Sphinx and assumed the power "to bring or defend any action, suit, prosecution or other legal proceedings, whether civil or criminal, in the name and on behalf of the company." JOLs Br. at 17 (quoting Cayman Companies Law § 109(a)). On September 11, 2006, the JOLs filed a brief in the district court, expressing their concern. At the time the JOLs filed their brief, they were in the process of investigating the

details behind the Settlement, and had not reached any firm conclusions about its legitimacy.

The district court rejected each of Investors' arguments. First, the district court found that Investors were "not directly and adversely affected pecuniarily by the challenged ruling of the Bankruptcy Court because they do not hold a direct interest in the Debtor." *Refco*, 2006 WL 3409088, at *4. The court therefore held that Investors did not have standing to appeal the Settlement. *Id.* at *5 (citing *In Re Colony Hill Assocs.*, 111 F.3d 269, 273 (2d Cir. 1997)). Second, the district court affirmed the bankruptcy court's determination that Investors were not a "party in interest" within the meaning of § 1109(b). The district court noted that "[a] party must be a creditor or debtor to have standing to object" to a settlement. *Id.* (citing *In re Comcoach Corp.*, 698 F.2d 571, 573 (2d Cir. 1983)). Because Investors were neither, the district court held that the bankruptcy court properly declined to consider Investors' objections to the Settlement. *Id.* at *6. Third, the district court held that the bankruptcy court appropriately declined to evaluate the fairness of the Settlement from the perspective of the Investors. *Id.* at *8. "[The bankruptcy court's] (only) obligations in evaluating the Settlement were to the Debtors' estate, creditors, and shareholders." *Id.* Finally, with respect to the bankruptcy court's refusal to stay the proceeding because of the Grand Court's order, the district court held that the bankruptcy court did not abuse its discretion. *Id.* at *9. The district court agreed that to stay the bankruptcy proceeding in favor of an involuntary proceeding in the Cayman Islands after the Settlement was announced would cause needless delay, and, in any event, the Committee's motion to approve the Settlement was not "against" Sphinx and was therefore not covered by the Cayman Court's injunction. *Id.* The district court did not make any substantive rulings with respect to the JOLs'

arguments.[6]

On appeal to this Court, Investors argue that the district court erred in dismissing their appeal of the bankruptcy court's order for lack of appellate standing. Investors assert that the approval of the Settlement will cost them tens of millions of dollars, thereby imposing upon them a direct, pecuniary harm sufficient to confer party-in-interest and appellate standing. Investors Br. at 26-31. In the alternative, Investors assert that when the Sphinx directors breached their fiduciary duty by entering a fraudulent settlement, the funds at issue became the *res* of a constructive trust, of which Investors were the beneficiaries. Because Investors hold a constructive trust over the money used to fund the Settlement, they argue, they have standing under the direct, pecuniary interest test. *Id.* at 36-37. Investors further contend that, even if their interest is not direct and pecuniary, the rule limiting appellate standing in the bankruptcy context to parties with a direct, pecuniary interest "is a prudential one, not constitutionally mandated, and, as such, courts have been willing to relax the rule in the interests of justice, . . . ." *Id.* at 33. Investors argue that the appellate standing rule should be relaxed in this case so that the bankruptcy process is not employed to consummate a fraud. *Id.* at 34. At a minimum, Investors claim, they should have been allowed to intervene under Federal Rule of Bankruptcy Procedure 2018(a), as they expressly sought to do in the bankruptcy court. *Id.* at 37. Investors assert that the district court ignored the factual record when it stated that Investors "were aware of the Adversary Proceeding for approximately five months but failed to request intervention until after

---

[6] There was nothing in the JOLs' brief that the district court needed to address; the JOLs' brief merely stated that they were in the process of investigating the Settlement and they could not adopt the positions of the Committee.

the Settlement was announced . . . ," *Refco*, 2006 WL 3409088, at *6, because it was only after the Settlement was announced that Investors had *reason* to intervene. Investors Br. at 38. Finally, Investors assert that the district court erred in concluding that the bankruptcy court did not abuse its discretion by failing to accord comity to the order of the Grand Court of the Cayman Islands. *Id.* at 49.

**DISCUSSION**

Like the district court, we review the bankruptcy court's articulation of the legal standards applicable to the evaluation of a settlement under Bankruptcy Rule 9019 *de novo*, *In re Iridium Operating, LLC*, 478 F.3d 452, 461 n.13 (2d Cir. 2007), including the bankruptcy court's view of the principles governing who may contest the settlement as a "party in interest" under § 1109(b). The bankruptcy court's application of those principles to the settlement is reviewed for abuse of discretion. *Id.*

A. *Whether Investors Have Party-In-Interest Standing*

Investors claim they had standing to appear before the bankruptcy court and object to the Settlement because they are a "party in interest" within the meaning of § 1109(b) of the Bankruptcy Code. That section, Investors argue, is to be construed broadly to allow all parties affected by the case to be heard. "Bankruptcy Code § 1109(b) was not intended to *exclude* injured parties from the judicial process, but instead to underscore that in bankruptcy, which so directly concerns issues of property rights, all affected entities should have access to justice." Investors Br. at 27.

Section 1109(b) provides that the term "party in interest [] includ[es] the debtor, the

-11-

trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee."[7] We previously explored the contours of the term "party in interest" in a slightly different context in *Comcoach*, 698 F.2d at 573-74.[8] There, we stated that "[w]hen interpreting the meaning of Code terms such as 'party in interest', we are governed by the Code's purposes." *Id.* at 573 (citation omitted). One of those purposes is to convert the bankrupt's estate into cash and distribute it among creditors." *Id.* (footnote and citation omitted). "Bankruptcy courts," we noted, "were established to provide a forum where creditors and debtors could settle their disputes and thereby effectuate the objectives of the statute." *Id.*

We acknowledged in *Comcoach* that the term "party in interest" is not defined by the Code. *Id.* But we noted that a "'real party in interest' is the one who, . . . , has the legal right

---

[7] To be clear, an "equity security holder" in this context is, of course, a *debtor*'s equity security holder. *See* 11 U.S.C. § 101(17) ("The term 'equity security holder' means holder of an equity security of the debtor."). This, the Investors – *i.e.*, *Sphinx*'s investors – clearly cannot claim to be.

[8] In *Comcoach*, we were interpreting the term "party in interest" in the context of a request for relief from a stay under 11 U.S.C. § 362(d)(1), and not in the context of the right to be heard under § 1109(b). 698 F.2d at 573. Strictly construing that term, we held that only a creditor could move to lift the automatic stay under § 362(d)(1). *Id.* at 573-75. While a general canon of construction counsels a similar interpretation of similar terms in the same statute, *see Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 478-79 (1992), one should be careful not to draw the overly broad conclusion from *Comcoach* that only creditors may be real parties in interest in *all* other types of bankruptcy proceedings. While § 362(d)(1) does not elaborate on who may qualify for party-in-interest standing for purposes of relief from a stay, § 1109(b) lists parties in interest who may properly object to judicial approval of a settlement between the bankruptcy estate and a third party. There is no doubt that Sphinx, as a party to the settlement, had party-in-interest standing to request the court's approval of the settlement. Whether Sphinx's *investors* may object to that settlement is, of course, another matter entirely.

-12-

which is sought to be enforced or is the party entitled to bring suit," and we rejected as incompatible with the purposes of the Code the notion that any particular creditor's interest may be asserted by anyone other than that creditor. *Id.*[9]

In reaffirming *Comcoach*'s underlying principle, we see no need to limit standing in the § 1109(b) context solely to the class of creditors and debtors permitted by *Comcoach* in the quite different context of § 362(d)(1).[10] *See supra* note 8. For, even granting § 1109(b) the benefit of somewhat greater breadth – breadth that might be warranted by the additional parties listed in the text of § 1109(b) but not in the text of § 362(d)(1) – Investors' equity argument still reads into § 1109(b) a degree of separation from the primary parties in a bankruptcy proceeding that we are unwilling to countenance. To the extent that the rights of a party in interest are asserted, those rights must be asserted by the party in interest, not someone else. The principle set forth in *Comcoach* therefore applies with equal force to this case. We reaffirm it today.

---

[9] Courts in our Circuit have consistently (and correctly) interpreted *Comcoach* to stand for the principle that party-in-interest standing under § 1109(b) does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding. *See Southern Boulevard, Inc. v. Martin Paint Stores* (*In re Martin Paint Stores*), 207 B.R. 57, 61-62 (S.D.N.Y. 1997) ("The concept [of party-in-interest standing] does not, according to the Second Circuit, encompass a creditor of one of the debtor's creditors . . . [Appellant] cannot establish standing by raising another person's legal rights." (internal quotation marks and citations omitted)); *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 849 (Bankr. S.D.N.Y. 1989) (citing *Comcoach* to reject a party's "assertion that due to its [self proclaimed] status as protector of consumer [] [creditors], it has the unique power to step into the[ir] shoes . . . , and receive their status as a party in interest" (first alteration in original)).

[10] *See Comcoach*, 698 F.2d at 573 (concluding that, in order for the plaintiff to have party-in-interest standing "[n]ecessarily, . . . , [it] must be either a creditor or a debtor to invoke the court's jurisdiction."); *Refco*, 2006 WL 3409088, at *5 ("A party must be a creditor or debtor to have standing to object." (citing *Comcoach*, 698 F.2d at 573)).

Investors cannot claim that they seek to enforce any rights distinct from those of Sphinx as a creditor and a defendant in an adversary proceeding. The record establishes that Sphinx is a single legal entity, and that the individual cells are not legally separate entities from Sphinx. By investing in Sphinx, Investors placed control of their funds entirely within the hands of the Sphinx directors (or managers acting on behalf of the directors). Only Sphinx, not individual Investors, or even Investors as a group, could assert a claim against the Refco estate, and only Sphinx was permitted to negotiate a settlement with the Committee. Investors maintain a financial "interest" in Sphinx, but they are not a "party in interest" within the meaning of the Bankruptcy Code. The party in interest in the bankruptcy sense, representing the Investors' financial interest, is Sphinx.

Investors spend many pages of their brief arguing passionately for an expansive interpretation of § 1109(b) to ensure that "fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." Investors Br. at 31 (quoting *Pepper v. Litton*, 308 U.S. 295, 305 (1939)). Laudable goals, to be sure. But one cannot avoid the conclusion that bankruptcy court is not the appropriate forum in which to resolve Investors' disputes with the Sphinx board. It may be that the Sphinx directors violated their fiduciary duties by entering a settlement that was not in the best interests of Investors.[11] That issue, however, is not for the bankruptcy court. Bankruptcy courts are primarily courts of equity, but they are not empowered to address *any* equitable claim tangentially related to the bankruptcy proceeding. Bankruptcy court is a forum where creditors

---

[11] We make no judgment on this issue.

-14-

and debtors can settle their disputes *with each other*. Any internal dispute between a creditor and that creditor's investors belongs elsewhere.

Investors point out that bankruptcy courts have declared that § 1109(b) should be construed "broadly."[12] They argue that a broad construction of § 1109(b) means that "*whenever* a party has an interest that is affected by a Bankruptcy Court determination, equity will allow that party to be heard, will require the court to consider that party's complaint in ascertaining whether the order sought is appropriate, and will allow an appeal of the court's determination." Investors Br. at 40. Even when a statute is broadly construed, however, it still has its limits. "The term 'party in interest' [in § 1109(b)] is broadly interpreted, but not infinitely expansive." *Southern Boulevard, Inc. v. Martin Paint Stores* (*In re Martin Paint Stores*), 207 B.R. 57, 61 (S.D.N.Y.

---

[12] Investors Br. at 27-28 (citing *Ionosphere*, 101 B.R. at 849-50; *In re Overview Equities, Inc.*, 240 B.R. 683, 686-87 (Bankr. S.D.N.Y 1999); *In re Torrez*, 132 B.R. 924, 933-34 (Bankr. E.D. Cal. 1991)). Investors also cite *Unofficial Comm. of Zero Coupon Noteholders v. Grand Union Co.*, where the district court granted party-in-interest standing to bondholders of the debtor's parent corporation who claimed that a plan of reorganization would render the parent unable to meet its obligations on the bonds. 179 B.R. 56, 58-59 (D. Del. 1995). The district court in *Grand Union* based its holding primarily on *In re Amatex Corp.*, where the Third Circuit defined a party in interest as one who "has a sufficient stake in the proceedings so as to require representation." *Id.* at 58 (quoting *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985)). The Third Circuit also indicated, however, that the determination of a sufficient stake should be made on a case-by-case basis. *Amatex*, 755 F.2d at 1042. We need not opine on whether we too would have recognized party-in-interest standing on the extraordinary facts in *Grand Union* or *Amatex*. This case, unlike *Amatex*, does not involve a debtor seeking to ensure guardian ad litem representation for parties with unmatured claims against the debtor that might be impaired by the reorganization plan. *See id.* at 1043-44. And, unlike the equity holder whose bondholders were permitted to intervene in *Grand Union*, Sphinx received tens of millions of dollars on its claim rather than nothing. Nor does it share several directors and officers with the debtor. *See* 179 B.R. at 57, 59. Moreover, *Grand Union* specifically limited its holding to "the particular facts and circumstances of th[e] case." *Id.* at 59. To the extent *Grand Union*'s reasoning applies beyond its particular facts and is in tension with our holding, we decline to follow it.

1997). As Chief Judge Lifland of the Bankruptcy Court for the Southern District of New York has stated:

> [I]t is important that a bankruptcy court is not too facile in granting applications for standing. Overly lenient standards may potentially over-burden the reorganization process by allowing numerous parties to interject themselves into the case on every issue, thereby thwarting the goal of a speedy and efficient reorganization. . . . Granting peripheral parties status as parties in interest thwarts the traditional purpose of bankruptcy laws which is to provide reasonably expeditious rehabilitation of financially distressed debtors with a consequent distribution to creditors who have acted diligently.

*Ionosphere*, 101 B.R. at 850-51 (internal citations and quotation marks omitted).

This admonition is pertinent to the matter at hand. Had the bankruptcy court permitted Investors to object to the Settlement and conduct discovery on the numerous factual issues that, according to Investors, would prove that the Settlement "was the product of tortious misconduct, collusion, and fraud by a faithless fiduciary," Investors Br. at 14, the Code's goal of a "speedy and efficient reorganization," *Refco*, 2006 WL 3409088, at *5 (quoting *Ionosphere*, 101 B.R. at 850), would have been frustrated. Investors sought to prove that the Settlement was not a properly authorized corporate act by Sphinx; that the board members who approved the Settlement on behalf of Sphinx, and the lawyers representing Sphinx, were subject to conflicts of interest; and that the debtor actually controlled Sphinx and therefore the Settlement was not the product of arms' length bargaining. Investors Br. at 14-15. This litany of wrongs allegedly wrought by the officers and directors of Sphinx upon Investors is fodder for a lengthy trial itself. It surely would have caused a substantial delay in the Refco bankruptcy proceeding.

In any event, a bankruptcy court's obligation is to determine whether a settlement is in the

best interests of *the estate*, not to ensure that the *creditors'* representatives are honoring their fiduciary duties. *See Nellis v. Shugrue*, 165 B.R. 115, 121 (S.D.N.Y. 1994) (Sotomayor, *J.*); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Matter of Energy Co-op, Inc.*, 886 F.2d 921, 927 (7th Cir. 1989). We agree with the bankruptcy court's astute observation that to permit Investors to lodge objections to the Settlement on the basis of their fiduciaries' appropriate approval would "entirely skew the task of Bankruptcy Court," and that it would be "extremely unfair to debtors" to force them to negotiate not only with the legal representatives of creditors, but also with any interest holders of a creditor.

We hold, therefore, that Investors are not a "party in interest" within the meaning of § 1109(b) of the Bankruptcy Code, and affirm the district court's holding that the bankruptcy court did not abuse its discretion by approving the settlement without ruling on the merits of the Investors' objections, allowing them to intervene, or affording them any opportunity for discovery.

We note that although they are not parties in interest entitled to object to the Settlement and conduct discovery, Investors may still have remedies for fraud perpetrated by their fiduciaries. Counsel for Investors indicated at oral argument that they intended to file suit against the Sphinx directors alleging breach of fiduciary duty. Assuming they file their claim within the appropriate jurisdiction, and overcome any pre-trial hurdles, they may then be permitted to conduct discovery on the issues they sought to investigate in bankruptcy court, and seek redress

before a judge or jury.[13]

### B. *Whether Investors Have Appellate Standing*

The district court held (alternatively) that Investors had no standing to appeal from the order of the bankruptcy court. Since party-in-interest standing is a necessary precondition for there to be appellate standing and Investors have no party-in-interest standing, there is no need for us to reach the alternative holding of the district court.

### C. *Whether JOLs May Appeal from the Settlement Order*

The JOLs assert that they have standing to appeal the bankruptcy court order on behalf of Sphinx. "It is settled law," the JOLs argue, "that a liquidator has standing to bring an action on a company's behalf." JOLs Br. at 27. We agree. But the JOLs may only bring an action on behalf of the company that the company could have brought itself. The JOLs have correctly noted that, "[a]s Cayman Islands court-appointed liquidators of Sphinx and its affiliates, the JOLs *stand in the shoes of* Sphinx." JOLs Resp. to Summ. Affirmance at 2 (emphasis added). Sphinx consented to the Settlement. Indeed, without Sphinx's consent, the Settlement Agreement would never have been presented to the bankruptcy court for approval. Having consented to the Settlement below, Sphinx is bound by it on appeal, for it is well-established that "a party to a consent judgment is thereby deemed to waive any objections it has to matters within the scope of

---

[13] Investors also argue that, even if they are not parties in interest, they should have been permitted to intervene in the bankruptcy proceeding pursuant to Federal Rule of Bankruptcy Procedure 2018(a). We disagree. Intervener status, no less than party-in-interest status, would permit Investors to take a stand on the Settlement contrary to that of Sphinx, requiring the debtor to negotiate with two faces of the same entity. It was not an abuse of discretion for the bankruptcy court to deny Investors' motion to intervene. *See Ionosphere*, 101 B.R. at 853.

the judgment." *Coughlin v. Regan*, 768 F.2d 468, 469-70 (1st Cir. 1985) (citations omitted).

"Appeal from a consent judgment is generally unavailable on the ground that the parties are deemed to have waived any objections to matters within the scope of the judgment." *New York ex rel. Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 69 (2d Cir. 1996) (citations omitted); *see also Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 526 (10th Cir. 1992); *Mallory v. Eyrich*, 922 F.2d 1273, 1280 (6th Cir. 1991); *Dorse v. Armstrong World Indus., Inc.*, 798 F.2d 1372, 1375 (11th Cir. 1986). Clearly, as a party to the Settlement Agreement, Sphinx is precluded from appealing the bankruptcy court's order. The JOLs, standing in the shoes of Sphinx, are, *ipso facto*, similarly precluded.

## D.

Because Investors have no standing to prosecute this appeal, and the JOLs are precluded from doing so, we need not consider the merits of their claims that the bankruptcy court abused its discretion by approving the settlement.

\*\*\*

## CONCLUSION

For the reasons stated above, the order of the district court is AFFIRMED.